IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES F. LEVET, | ) | CASE NO. 1:14CV1378 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Charles Levet ("Levet") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Levet filed an application for DIB on October 28, 2011, alleging a disability onset date of November 2, 2009.  Tr. 25, 150.  He alleged disability based on the following: acetabular left fracture with extension to left iliac, constant leg and hip pain, inability to sit for over an hour, and an inability to walk more than 1,000 feet at one time.  Tr. 162.  After denials by the state agency initially (Tr. 98) and on reconsideration (Tr. 105), Levet requested an administrative hearing.  Tr. 112.  A hearing was held before Administrative Law Judge ("ALJ") Kendra S.

Kleber on January 8, 2013.  Tr. 41-75.  In her February 15, 2013, decision (Tr. 25-36), the ALJ determined that there were jobs that existed in significant numbers in the national economy that Levet could perform, i.e., he was not disabled.  Tr. 35.  Levet requested review of the ALJ's decision by the Appeals Council (Tr. 21) and, on April 23, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Levet was born in 1950 and was 61 years old on the date his application was filed.  Tr. 34, 159.  He completed twelfth grade.  Tr. 163.  He previously worked as a cab driver and an electrician.  Tr. 164.  He last worked in October 2009.  Tr. 235.

### B. Relevant Medical Evidence

On November 2, 2010, Levet went to the emergency room after he fell off a ladder and injured his left hip.  Tr. 221.  An x-ray of his left hip showed an acetabular fracture with extension into the body of the iliac bone, slightly displaced.  Tr. 213.

On February 16, 2011, Levet reported that his hip pain was improving but that he continued to experience pain.  Tr. 288.  His pain was worse when sitting and was interfering with his sleep.  Tr. 286.  He began physical therapy.  Tr. 288.

On March 8, 2011, Levet had a follow-up visit.  Tr. 245.  He was using crutches and was partial weight-bearing.  Tr. 245.  He had been going to physical therapy but reported occasional buckling of his left leg and his hip catching.  Tr. 245.  An x-ray of his left hip revealed a well-healed fracture.  Tr. 279.

On April 14, 2011, Levet reported to his physical therapy instructor that he was "100% better" and he could perform all activities of daily living without difficulty.  Tr. 306-307.

2

On April 3, 2012, Levet saw orthopedic specialist John H. Wilber, M.D.  Tr. 343-344. Levet reported pain in his hip area when sitting and with prolonged standing or walking.  Tr. 343.  Upon physical examination, Levet was in no acute distress and had a normal gait, symmetrical pelvis, no anterior tenderness, a good range of motion through his hips and back, and was tender over his ischium and the posterior wing of his ilium.  Tr. 343.  X-rays revealed that his fracture healed with good alignment.  Tr. 343.  Dr. Wilber prescribed a CT scan.  Tr. 343.

On April 17, 2012, Levet returned to Dr. Wilber for an evaluation after his CT scan.  Tr. 331.  Dr. Wilber explained that Levet's fracture had healed well but that there were some degenerative changes involving his hip joint.  Tr. 331.  Dr. Wilber noted, "[h]e does have some early post-traumatic arthritis involving the hip which is probably his major problem."  Tr. 331. Dr. Wilbur opined that Levet's hip looked "too good to consider replacement at this time" and advised stretching, strengthening and non-impact activities.  Tr. 331.  He relayed that Levet should take anti-inflammatories as needed and should return if his hip symptoms got worse.  Tr. 331.

After the ALJ's decision, on July 24, 2013, Levet saw Dr. William Bohl for a second opinion regarding his hip injury.[1]  Tr. 7.  Upon physical examination, Levet was "quite tender over the left sacroiliac joint with a positive Patrick's test.  Thigh thrust test and compression test are however negative."  Tr. 7.  He had a good range of motion and sensory and motor examinations were normal.  Tr. 7.  Reflexes and straight leg raising were normal.  Tr. 7.  Dr. Bohl ordered x-rays of Levet's sacroiliac joint and opined that his fracture "may have extended

---

[1] This evidence was presented to the Appeals Council.  Tr. 6.

3

into the lower portion of this joint." Tr.7. Dr. Bohl discussed treatment options; Levet "did not even want to try the injection." Tr. 7.

### C. Medical Opinion Evidence

#### 1. Consultative Examiner

On January 3, 2012, Levet saw Michael Hanes, M.D., for a consultative examination. Tr. 308-317. Levet complained about his worsening left hip and buttock pain, which he described as a constant irritation and like he was sitting on a bone. Tr. 313. That day his pain was a 2/10 but he reported that it varies in intensity up to 8/10. Tr. 313. His pain increased with prolonged sitting, walking and going up stairs; it is relieved by changing positions, lying down on his left side, and using a wheelchair cushion. Tr. 313.

Upon examination, Dr. Hanes found that Levet's pelvis was symmetrical, his lumbar lordotic curvature was normal, his range of motion was normal, and straight leg raising was negative bilaterally. Tr. 316. He had tenderness to palpation in his ischial tuberosity on his left side and in his left gluteal area. Tr. 316. There was no evidence of spasm or any trigger points. Tr. 316.

Dr. Hanes described Levet's fracture as "conservatively managed and now well-healed." Tr. 317. He noted that Levet stated that he can sit for 30 minute intervals and stand for 60 minute intervals and that he is independent in all activities of daily living and that he drives. Tr. 316.

Based on Levet's history and physical exam, Dr. Hanes opined that Levet has mild functional limitations. Tr. 317. He found that Levet can lift/carry up to 35 pounds at waist level frequently and should avoid repetitive stooping, squatting, bending, and lifting from ground

4

level.  Tr. 317.  He can sit for five to six hours a day with 30 minute intervals and can stand for 60 minute intervals for at most six hours a day.  Tr. 317.

### 3. State Agency Reviewers

On January 6, 2012, state agency reviewing physician William Bolz, M.D., reviewed Levet's file.  Tr. 80-85.  Regarding Levet's residual functional capacity ("RFC"), Dr. Bolz opined that Levet can perform light work and that he can stand for 60 consecutive minutes for a total of 6 hours per workday and can sit for 30 consecutive minutes for a total of 6 hours per workday.  Tr. 81.  He can occasionally climb ramps, stairs, ladders, ropes and scaffolds, and can occasionally kneel, stoop, and crouch.  Tr. 81.  He found that Levet was "fully credible."  Tr. 80.

On March 3, 2012, state agency physician Nick Albert, M.D., affirmed Dr. Bolz's opinion.  Tr. 92-96.

## E. Testimonial Evidence

### 1. Levet's Testimony

Levet was represented by counsel and testified at the administrative hearing.  Tr. 46-65.  He last performed work in 2009 as a cab driver.  Tr. 47-48.  He explained that he drove a van and mostly transported people and their luggage and also transported packages, such as medication.  Tr. 48.  Rarely, he transported furniture.  Tr. 48.  On a regular basis, he lifted 60 to 70 pounds, "whatever a suitcase weighs."  Tr. 49.  He stopped working because it was not economical for him to continue, given the amount of money he was making and the need for someone to stay home with the children to homeschool them after his wife began full-time employment as a teacher.  Tr. 48.  Two of his children are high school age and one is middle school age.  Tr. 61.

Prior to driving a cab, Levet worked full time as an electrician.  Tr. 49.  He regularly lifted up to several hundred pounds because the job involved laying pipe underground and

5

putting up transformers in walls. Tr. 49. He trained for the job by undertaking a four-year apprenticeship. Tr. 50. He was laid off and testified that, had he not been laid off, he could have continued performing the work. Tr. 50. However, he stated that he could not perform that work now because the job was too physical. Tr. 50. He also stated that he could no longer drive a cab because there is a lot of physical activity involved in that job as well, such as getting in and out of the cab and handling luggage. Tr. 51. He is also unable to sit that long anymore. Tr. 51.

Levet testified that, currently, he can sit for 15 to 20 minutes at a time, and 30 minutes "max." Tr. 51. During the course of the day, he stands and sits down or leans on things, "[w]hatever it takes to take the pressure off my hip." Tr. 51. He testified that, if he could lean against something without difficulty, he could perform work that permitted him to lean on something or stand next to something. Tr. 51-52. He can stand for 45-60 minutes at a time, after which he has to lean on something or sit down. Tr. 57-58.

Levet stated that he last saw Dr. Wilber, his orthopedic doctor, in or around July 2012. Tr. 53. He relayed that Dr. Wilber told him that the CT scan of his left hip looked good. Tr. 52. Dr. Wilber did not offer pain medication even though Levet told Dr. Wilbur that he had pain. Tr. 52. Levet testified that the last time he took pain medication regularly was after he got out of the hospital following his surgery in November 2010, until April 2012, by which time he was going to physical therapy and was "weaning" himself off his medication. Tr. 53. The prescribed medication, codeine and muscle relaxers, caused no side effects. Tr. 56. He was instructed, "don't stay on [the prescription pain medication] longer than you don't have to." Tr. 57. Since then, he has been regularly taking baby aspirin (81 milligrams) that was prescribed by his primary care physician for the unrelated reason that aspirin is what "you're supposed to take when you get older." Tr. 54. He has not taken any prescription pain medication during the

almost two years since physical therapy ended in April 2011 and the hearing date in January 2013.  Tr. 55-56.  He testified that the prescription pain medication "probably made a difference.  I was still in pain at that point in time.  If I wasn't on it, I probably would have been in a lot more pain."  Tr. 57.  He takes over-the-counter Tylenol or Bayer when he is in extreme pain a few times a month, and his pain "subsides," although it does not go away.  Tr. 63.

Levet testified that his pain "feels like I'm sitting on my bone," a "sharp pain [] into my hip."  Tr. 56.  The pain interferes with his ability to do "just about anything normal."  Tr. 58.  He has to stand in between two stairs to put his socks and shoes on; he leans against two railings on the stairway.  Tr. 58.  He can load and empty the dishwasher though it is painful to bend over.  Tr. 58.  It is also painful to go up and down stairs and "impossible" to carry weight up and down the stairs.  Tr. 58.  To relieve the pain, he lies down on his bed with a pillow between his legs for a half an hour, after which time he is "ready to go again."  Tr. 59.  He has to do this when he does "more than normal or if I push myself."  Tr. 59.  He described "more than normal" activity as "not just one thing" but an "accumulation of things.  Like if I go out and I put rock salt down on the drive and carry the bag down the drive, and then I come in and I empty the dishwasher or something to that effect, it causes a lot of pain.  It's just you know normal activities puts me down."  Tr. 59.  When asked, Levet stated that the bag of rock salt weighs 20 pounds and that his driveway is 60 or 70 feet long and that he performed this activity a few days before the hearing because it snowed.  Tr. 59-60.

Levet no longer does yard work and he no longer goes out to dinner because it is too painful to sit and wait for a meal.  Tr. 60.  He does not clean the windows and no longer gets up on the ladder.  Tr. 60.  He still goes grocery shopping.  Tr. 61.  When he gets to the back of the

7

store, he is in pain. Tr. 61. Homeschooling his children is "a lifestyle. It's all day long, all night, however long it takes, but it's not standing or sitting in one spot." Tr. 63.

### 2. Vocational Expert's Testimony

Vocational Expert Robert Mosely ("VE") testified at the hearing. Tr. 65-74. The ALJ discussed with the VE Levet's past relevant work as a cab driver and a journeyman electrician. Tr. 66-67. The ALJ asked the VE whether the skills Levet learned as an electrician would be transferable to other jobs performed at the light level. Tr. 67. The VE answered that they would and listed the following jobs as examples: bench assembly and bench inspection-type jobs, such as electrical assembler (1,800 northeast Ohio jobs; over 6,000 Ohio jobs; over 100,000 national jobs); assembler, semiconductors (1,500 northeast Ohio jobs; over 6,000 Ohio jobs; over 100,000 national jobs); and electrician supervisor (1,500 northeast Ohio jobs; over 6,000 Ohio jobs; over 100,000 national jobs). Tr. 68. The ALJ asked the VE to determine whether a hypothetical individual of Levet's age, education and past work experience could perform the aforementioned jobs identified by the VE if that person had the following characteristics: can occasionally lift 20 pounds or frequently lift 10 pounds; can stand or walk for six hours in an eight-hour workday, but only for 60 minutes at a time; can sit for six hours in an eight-hour workday, but only for 30 minutes at a time; can occasionally climb ramps and stairs but never climb ladders or scaffolds; can occasionally stoop or crouch but can never kneel or crawl. Tr. 69-70. The VE testified that the person could perform the jobs that he previously identified and that the limitations recited by the ALJ would not reduce the number of available jobs. Tr. 70.

Next, Levet's attorney asked the VE whether the job Levet previously performed, journeyman electrician, contained different skills than the jobs identified by the VE. Tr. 70. The VE answered that, although the work settings may be different, the skills involved are similar.

Tr. 70-71.  Levet's attorney asked the VE whether his answer to the ALJ's hypothetical question would be different if the hypothetical individual would need a 15 minute break after standing for 60 minutes and the individual would not be working during the 15-minute break.  Tr. 71-72.  The VE replied that such a limitation would affect the individual's ability to maintain employment and would, therefore, preclude the jobs previously identified by the VE.  Tr. 72.  Levet's attorney asked how many days an employer would tolerate an individual missing work.  Tr. 72.  The VE stated that his experience had taught him that missing two or more days per month would affect the ability to maintain employment.  Tr. 72.

The ALJ asked the VE whether his answer regarding absences was specific to unskilled work in general or work at the skill level performed in the jobs the VE identified.  Tr. 73.  The VE answered that, in his experience, an absence of two days a month would affect the ability to perform unskilled or semi-skilled work, but that the absences would matter more in unskilled work.  Tr. 73.  The ALJ asked the VE what other areas of vocational adjustment would be required for the hypothetical individual previously described by the ALJ to transition into the kind of jobs the VE identified.  Tr. 73.  The VE answered that the jobs he identified would not require as much skill as the work Levet previously performed.  Tr. 73-74.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her February 15, 2013, decision, the ALJ made the following findings:

1. Mr. Levet meets the insured status requirements of the Social Security Act through June 30, 2014. Tr. 27.

2. Mr. Levet has not engaged in substantial gainful activity since November 2, 2010, the alleged onset date. Tr. 27.

3. Mr. Levet has the following severe impairments: degenerative changes of the left hip joint and obesity. Tr. 27.

4. Mr. Levet does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 29.

5. Mr. Levet has the residual functional capacity to perform a limited range of light work. Specifically, he can perform work that requires him to lift or carry 20 pounds occasionally and 10 pounds frequently. He can stand or walk for six hours out of an eight hour workday for 60 minutes, or sit for six hours of eight for 30 minutes at a time. He can occasionally climb stairs or ramps, or stoop, or crouch. The work he can perform does not require climbing ladders or scaffolds, or crawling or kneeling. Tr. 30.

6. Mr. Levet is unable to perform any past relevant work. Tr. 34.

7. Mr. Levet was born on May 1, 1950 and was 60 years old, which is defined as an individual of advanced age, on the disability onset date. Tr. 34.

8. Mr. Levet has at least a high school education and is able to communicate in English. Tr. 35.

9. Mr. Levet has acquired work skills from his past relevant work. Tr. 35.

10. Considering Mr. Levet's age, education, work experience, and residual functional capacity, Mr. Levet has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. Tr. 35.

11

11.      Mr. Levet has not been under a disability, as defined in the Social Security Act, from November 2, 2010, through the date of this decision. Tr. 36.

## V. Parties' Arguments

Levet objects to the ALJ's decision on two grounds. He argues that substantial evidence does not support the ALJ's credibility determination and her finding that Levet can perform light work. Doc. 14, pp. 4-8. In response, the Commissioner submits that the ALJ's decision is supported by substantial evidence and her RFC assessment complied with the requirements set forth in the regulations. Doc. 15, pp. 6-9.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. Substantial evidence supports the ALJ's credibility determination

Levet argues that the ALJ's finding—that Levet's statements concerning the intensity, persistence, and limiting effects of his symptoms of pain are not entirely credible—is not supported by substantial evidence. Doc. 15, p. 5. He argues that the ALJ should have found his

complaints of pain fully credible because they are supported by objective evidence; consistent reports of pain documented in medical records; the state agency reviewer's opinion that Levet is fully credible; and Dr. Hanes' finding that Levet is "a reliable historian." Doc. 14, pp. 5-6.

A disability claim can be supported by a claimant's subjective complaints as long as there is objective medical evidence of the underlying medical condition in the record. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken." *Id*. (citing 20 C.F.R. § 404.1529(c)(3)). To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used. 20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms. *Id*. Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work. *Id*. The ALJ should consider the following factors in evaluating a claimant's symptoms:

> 1) the individual's daily activities;
> 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3) factors that precipitate and aggravate the symptoms;
> 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*; *see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); SSR 96-7p, 1996 WL 374186, *2.

Here, the ALJ undertook the appropriate analysis and determined that Levet's statements about his limitations lacked credibility. Tr. 30-34.  In reaching her determination, the ALJ provided several reasons for discounting Levet's credibility, including his lack of treatment with pain medication or other, alternative treatment beyond physical therapy just after surgery; objective medical evidence in the form of a CT scan that showed a well-healed fracture with only a mild degenerative change in Levet's sacroiliac joint; the opinion of his treating orthopedist, Dr. Wilber, that, for arthritis, Levet "should work on stretching, strengthening and non-impact activities"; treatment notes indicating a good range of motion and strength; Levet's testimony, i.e., that he carried a 20 pound bag of rock salt down his driveway a few days before the hearing

and that he did not take medication because he "wants to feel the pain"; and the opinion of Dr. Hanes, the consultative examiner, that Levet had only mild functional limitations.  Tr. 31-33.  *See* SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received).

Levet argues that he had good reason to refuse prescription pain medication—he tried it in the past "yet still experienced pain while taking pain medication" and, because it did not help, "decided to forego medication that did not help and had the potential for adverse side effects and addition."  Doc. 14, p. 5.  Levet's argument is belied by his own testimony wherein he admitted that the pain medication he took immediately after surgery "made a difference" in the amount of pain that he felt and that, if he had not taken the pain medication, "I probably would have been in a lot more pain."  Tr. 57.  Moreover, he cites no evidence that he had complained of adverse side effects of pain medication or that he had reason to believe he would be susceptible to becoming addicted.  The ALJ accurately characterized Levet's testimony of conservative pain medication treatment, i.e., that Levet "might take Tylenol or Bayer aspirin one to three times a month if pain is extreme."  Tr. 33, 63-65.

Levet asserts that, although he can "perform certain activities on certain days," he testified that he "pays for it."  Doc. 14, p. 5.  The ALJ acknowledged that evidence supports Levet's assertion that he has pain when he over-exerts, but also remarked that Levet willingly exerted himself: "it is significant to me that [Levet] would even try [to carry a 20 pound bag of rock salt down a 60-70 foot long driveway] especially since one does not merely spread rock salt on driveways, one spreads it on snowy or icy driveways."  Tr. 32.  Finally, that the state agency reviewers found Levet "entirely credible" does not undermine the ALJ's credibility finding,

15

especially when, as here, the ALJ adopted the state agency reviewers' RFC determinations, which, in turn, were based on Dr. Hanes' assessment.  Tr. 32, 317, 81, 92-93.  In other words, the state agency reviewers, despite finding Levet "entirely credible," did not assign a more limited RFC than the ALJ.  Levet does not explain what additional limitations should have been credited.  He merely speculates that, "had these [state agency reviewing] physicians heard [Levet's] testimony, their opinions about his maximum RFC could very well have changed to include [the] need for breaks due to pain or a finding that [Levet] cannot sustain work day in and day out."  Doc. 14, p. 6.

In short, Levet merely asks the Court to re-weigh the evidence and make a credibility determination, which the Court may not do.  See *Rogers*, 486 F.3d at 247; *Garner*, 745 F.2d at 387.  Because substantial evidence supports the ALJ's credibility assessment, her decision should be affirmed.

### B. The ALJ's RFC assessment complied with the regulations and is supported by substantial evidence

Levet argues that the ALJ's RFC is not supported by substantial evidence.  Doc. 14, p. 7.  He asserts that "he cannot perform light work day in and day out due to the nature of his pain."  Doc. 14, p. 7.  Specifically, he contends that his "need for breaks to relieve pain prevents the performance of light work" and that the ALJ failed to follow SSR 96-8p when assessing his RFC.  Doc. 14, p. 7.

Levet's arguments primarily focus on the ALJ's credibility assessment, which the undersigned has considered, *supra*.  Levet more specifically argues that he "would need a break for 15 minutes" after standing for one hour, and that, had the ALJ considered his need for a break, he would have been found disabled based on the VE's testimony.  Doc. 14, p. 8.  Levet does not cite evidence in the record wherein any medical provider opined that he would need a

16

fifteen minute break after standing for one hour, during which time he would be unable to perform work. Although he states that the ALJ did not "fully consider" Dr. Hanes' opinion that "breaks are necessary after prolonged activity such as standing," Doc. 14, p. 8, Dr. Hanes' opinion did not in fact state that breaks are necessary after prolonged activity such as standing, let alone specify the duration of those breaks. *See* Tr. 317.

Because the ALJ's RFC assessment complied with the regulations and is supported by substantial evidence, her decision should be affirmed. *See Jones*, 336 F.3d at 475.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: September 10, 2015

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)